1  TERRI KEYSER-COOPER
   Law Office of Terri Keyser-Cooper
2  Nevada Bar #3984
   3590 Barrymore Dr.
3  Reno, NV 89512
   Tele (775) 337-0323
4  *Attorney for Plaintiff Lisa Bonta*

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                         **DISTRICT OF NEVADA**

10 LISA BONTA                        Case No.  3:18-CV-00012-RCJ-WGC

11        Plaintiff,                 **OPPOSITION TO DEFENDANTS**
                                     **MOTION TO DISMISS PLAINTIFF'S**
12     vs.                           **FIRST AMENDED COMPLAINT[1]**

13 WASHOE COUNTY and CITY OF RENO,

14        Defendants.

15
   _____/
16

17 **I.      PRELIMINARY STATEMENT**

18        The question in this case is whether a disabled witness held pursuant to a law enforcement

19 investigation is entitled to the protections of the Americans With Disabilities Act ("ADA") of a

20 "reasonable accommodation" during a law enforcement investigation. Plaintiff, a disabled woman,

21 currently in Hospice Care,[2] was held by Defendants pursuant to an investigation into the shooting

22 death of her husband by police officers. Plaintiff, and others on her behalf, communicated **15 times**

23 to Defendants, that Plaintiff had an urgent need for her oxygen and medications which were locked

24 inside her apartment. Even though the shooting had occurred outside Plaintiff's apartment, the

25
_____

27      [1] Since Defendants motions raise identical arguments, in the interested in judicial efficiency
   and convenience to the Court, Plaintiff opposes both motions in a single opposition.

28      [2] Since the filing of the FAC, Plaintiff has been put on Hospice Care as her cancer has
   spread.

                                                                                              1

apartment was a crime scene and Plaintiff was denied entry into her apartment to retrieve her necessary oxygen and medications.

There is no dispute that Plaintiff was not a criminal suspect—she was a victim and a witness. Plaintiff wanted to cooperate and assist law enforcement, as would any good citizen, but she also needed her oxygen and medications. Her health and life depended on 24 hour access to her medications and oxygen. Defendants listened to Plaintiff and others as they made clear Plaintiff urgently required her medications and oxygen. Defendants told Plaintiff and others, **more than 10 times,** that Plaintiff's items would be momentarily supplied. Defendants said they were "working on it" and "someone would be retrieving the items." **These false statements misled Plaintiff into believing her life sustaining medications and oxygen would be momentarily supplied.** Plaintiff did not suspend her questioning because she believed, reasonably, her items would be promptly supplied and she was not free to leave. Plaintiff had no reason to disbelieve Defendants.

In general, most people believe law enforcement officers are good people intent on being helpful. However, Defendants had no intent to supply Plaintiff with her oxygen and medications and were deliberately indifferent to her needs. Defendants blew Plaintiff off. Defendants ignored Plaintiff. Defendants disregarded Plaintiff in the manner that disabled people have been disregarded, trivialized, and minimized in society for years. It is precisely for that reason that the ADA was created.

> Congress enacted the ADA after finding that "individuals with disabilities continually encounter various forms of discrimination, including outright exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, and failure to make modifications to existing facilities and practices…" 42 U.S. C. Section 12101(a)(5). The ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. Section 12101(b)(1). The Act responds to what Congress described as a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled individuals. *Fortyune v. American Multi-Cinema, Inc.,* 364 F.3d 1075, 1080 (2004).

The recent case of *Updike v. Multnomah County,* 870 F3d 939, 951 (9ᵗʰ Cir. 2017) made clear: "A public entity may not disregard the plight and distress of a disabled person." What could reasonably be more distressing to a disabled person than the inability to have access to his or her medication and oxygen. What plight could be greater to a disabled person than to be repeatedly told by law enforcement their medications and oxygen would be supplied only to find there is no intent to do so.

Plaintiff understood her duty as a good citizen to work with law enforcement in their investigation. But by the same token, Plaintiff did not want to be without her necessary oxygen and medications. Once law enforcement locked Plaintiff in an ambulance, Plaintiff did not feel free to leave—Plaintiff instead kept asking for her medications and oxygen and kept being told the necessary items would be momentarily forthcoming.[3] Plaintiff believed Defendants in their numerous representations. Plaintiff reasonably believed Defendants would supply her with her medications and oxygen. Yet, Defendants, with callous disregard for Plaintiff's health and safety, ignored her and the others who spoke on her behalf. In so doing, Defendants caused Plaintiff enormous physical pain and distress.

## II.   FACTUAL BACKGROUND

The following facts are taken from Plaintiff's First Amended Complaint ("FAC"). Plaintiff Lisa Bonta is a disabled woman, terminally ill with stage four end stage metastatic breast cancer and a variety of other illnesses. (FAC ¶¶6-7). Plaintiff requires multiple daily medications and oxygen which must be provided 24 hours a day through a nasal cannula. (*Id*. ¶6.) On the evening of October 21, 2017, Plaintiff was home in bed, on oxygen, at her apartment in Sparks recovering from

---

[3] Defendants disingenuously assert throughout their Motions that Plaintiff was free to leave and could have gone to get her own medications and oxygen or gone to an emergency room. Plaintiff was locked in the ambulance and pleaded to be allowed to use the bathroom. Her request was denied and she was told a bathroom would be available at the Sparks Police Department where she would be taken. (FAC, ECF 25, ¶23). If Plaintiff believed she was "free to leave" she would have immediately taken herself to the nearest restroom.

3

a surgery involving the insertion into her abdominal area of a pain pump to provide morphine as a pain killer. (*Id*. ¶7.)  In the early morning hours of October 22, 2017, Plaintiff's estranged husband, Johnny was shot dead after a night of drinking in and around Plaintiff's apartment and a resulting confrontation with the police. (*Id*. ¶¶ 8-9.)

Immediately prior to the shooting, Johnny had threatened Plaintiff with a gun. Plaintiff, frightened, told her 16-year-old daughter Marissa to call 911. (*Id*. ¶ 9). Plaintiff, wearing only shorts and a thin sleep shirt, got out of bed, disconnected herself from her bedroom oxygen tank, and went to get Johnny a glass of water to "calm him down." (*Id*.). Within five minutes the Sparks police officers arrived and quickly removed both Plaintiff and her daughter from the apartment. Plaintiff was now outside, disconnected from her oxygen and away from her medications. (*Id*.) Plaintiff heard shots and understood Johnny had been shot outside her apartment. The shooting itself is not the basis of the lawsuit, but rather Plaintiff's treatment by Defendants at the scene and immediately thereafter at the Sparks Police Department ("SPD"). (*Id*. n.2).

At or about 4:00 a.m., after the shooting, Plaintiff, her service dog, and Marissa were quickly hurried by officers into a nearby ambulance. (*Id*. ¶11.) The ambulance was empty, no medical personnel remained inside. Plaintiff, her service dog, and Marissa were the sole ambulance occupants. (*Id*.). Plaintiff was cold, frightened, in shock—most importantly she was now without her oxygen and medications. Plaintiff did not see any oxygen in the ambulance or any nasal cannulas. (*Id*. ¶12).  Plaintiff would happily have used oxygen available in the ambulance if she had seen it, known where it was, was able to connect to it, or if medical personnel had assisted her. (*Id*. & n.3).

Marissa called her 33-year-old sister Jill to inform her of the situation, and when Jill arrived, at or about 4:00 a.m., a Reno Police Department ("RPD") officer told Jill Plaintiff and Marissa were

in the ambulance. (*Id*. ¶13). Jill explained that Plaintiff was terminally ill with stage four breast cancer and needed her medications and oxygen. Jill explained she was Plaintiff's caregiver and that Plaintiff had recent surgery and had been bedridden for the past week. (*Id*.). The officer told Jill there was oxygen in the ambulance. (*Id*.). Another RPD officer told Jill she had to leave the area, so she did. (*Id*.). Also, at or about 4:00 a.m., Plaintiff called her 31-year-old son Bryce to inform him of the situation, and when he arrived at about 4:50 a.m., he told an RPD officer he was there to check on his mother. (*Id*. ¶¶ 19-20). Bryce explained to the RPD officer he was there to "pick up his mother" and to make sure she was "okay" as she had cancer and needed her oxygen and medications. (*Id*. ¶20). The officer told Bryce it was an "active crime scene" and he had to leave. Bryce left, as instructed by the officer, and called Jill to discuss the situation. (*Id*.).

At or about 5:00 a.m., the ambulance door opened. Plaintiff told the RPD officer opening the door she was in "urgent" need of her medications and oxygen, explaining she was terminally ill with stage four breast cancer and on oxygen 24/7.  (*Id*. ¶21). The officer said another officer would come speak to her. (*Id*.). At about 6:00 a.m., the ambulance door was opened again by an RPD officer. Plaintiff again requested an urgent need for her oxygen and medication. (*Id*. ¶23). The officer said, "We will get someone." (*Id*.). By this time, Plaintiff was in acute physical distress. Her morphine pain pump was in the house, she was cold, barefoot and without a coat. Plaintiff's muscles were cramping, which happens when Plaintiff does not have sufficient oxygen. (*Id*.).

At about 6:45 a.m., the ambulance door opened again, RPD Detective McQuattie asked for Plaintiff's and Marissa's names and social security numbers and explained they would be taken to SPD ("Sparks Police Department") where everything they need would be provided. (*Id*. ¶ 24). At approximately 7:00 a.m., McQuattie again opened the door, Plaintiff explained to McQuattie that she was a stage four breast cancer patient, terminally ill, and required her medications and oxygen.

(*Id*. ¶ 25). McQuattie again repeated everything would be provided at SPD. (*Id*.).

At approximately 7:15 a.m., Plaintiff, Marissa and the service dog arrived at SPD and waited together for about 30-45 minutes. (*Id*. ¶ 26). Plaintiff asked McQuattie where her medications were, McQuattie told Plaintiff "Nothing can be removed from the apartment for up to 24 hours. I'll see what I can do." (*Id*.). McQuattie, like the other RPD officers, took no steps to ascertain the seriousness of Plaintiff's health crisis or to provide oxygen or medication. (*Id*.).

At about 8:00 a.m., Washoe County Sheriff's Office ("WCSO") Detective McVickers introduced himself to Plaintiff and took Plaintiff away for questioning. (*Id*. ¶ 27). Plaintiff asked McVickers about her medications and oxygen, and explained her urgent need. McVickers replied that nothing could be removed from the apartment for up to 24 hours but he would see what he could do. (*Id*.). McVickers and McQuattie then interviewed Plaintiff for 2-3 hours. Plaintiff had great difficulty with the interview which lasted more than two hours, because she was in pain, cold, and discomfort. (*Id*.). In response to Plaintiff's entreaties, during the interview, McVickers said he would, "Make some calls to people at the crime scene and see what we can do." (*Id*.).

During the interim, at or about 8:15 a.m., Jill and Bryce were at Plaintiff's apartment pleading for officers to allow them to retrieve their mother's oxygen and medication. Jill explained: "My mom is terminally ill and needs her medications and oxygen, can you please get it for her?" (*Id*. ¶¶ 31-32). Jill told the officers where the medication and oxygen were located. (*Id*.). The RPD officer said the crime scene could not be disturbed. (*Id*.). He said he made a call to Jack Buell of the WCSO. "He is going to be expecting you, go to SPD and ask for Jack Buell. (*Id*. ¶ 33). "You can go to SPD, when we get this wrapped up we'll send someone over with the items." (*Id*. ¶ 33).

When Jill and Bryce arrived at SPD, they contacted WCSO Officer Buell. Buell told them Plaintiff was being interviewed and they were working on getting someone to bring the medications

and oxygen. (*Id*. ¶ 34). Buell said he would ask Plaintiff what she needed when she was finished with her questioning. (*Id*.). Nothing was done by the time Plaintiff finished her interview at 10:30 or 11:00 a.m. (*Id*. ¶ 36). At that time, Plaintiff told Buell exactly which items were needed and where they were in the apartment. Buell said he would make some calls once Marissa's questioning was done. (*Id*.). Plaintiff was in desperate need: she was shaking, disoriented, and short of breath. Plaintiff's hands were twisted and cramped from lack of oxygen. Plaintiff told Buell, "I want to end the interview with Marissa. I need to have my medications and oxygen." (*Id*.).

At about 11:30 a.m., McVickers took Plaintiff upstairs where she ended the interview with Marissa. (*Id*. ¶ 37). Buell made a list of what was needed and Plaintiff explained where the medications and oxygen were located. (*Id*.). She explained she had a portable oxygen canister by the door. (*Id*.). She asked for some clothes and shoes. Buell said he would make a call and see what he could do about having the items delivered to SPD. (*Id*. ¶ 37).

Plaintiff went to Bryce's house to rest while Jill stayed at SPD waiting for the items. (*Id*. ¶ 38). At approximately 12:45 p.m., Jill received a paper bag containing dirty clothes, Bonta's purse, but not her medications or oxygen. The RPD officer said: "This is all you'll get." (*Id*.). He added, "You'll get the rest of the stuff when you get the keys to the apartment." (*Id*.). At about 5:00 p.m., Jill received a call from SPD informing her she could retrieve the keys. (*Id*. ¶ 39). Jill and her mother arrived at the apartment at about 6 p.m.  (*Id*.). Plaintiff had gone without her medications for approximately 14 hours. (*Id*.). Plaintiff remained in bed for a week, recovering. (*Id*.).

Plaintiff has sued Washoe County and the City of Reno for failure to accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. Section 12132, and the Rehabilitation Act ("RA"), 29 U.S.C. Section 794.

## II.      STANDARD OF LAW

On a motion to dismiss, the factual allegations of the complaint must be accepted as true. *Cruz v. Beto*, 405 U.S. 319, 322 (1972). A court is bound to give plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *Retail Clerks Int'l Ass'n v. Schermerhorn,* 373 U.S. 746, 753 N. 6 (1963). A plaintiff need not allege specific facts beyond those necessary to state his claim and the grounds showing entitlement to relief." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007). A court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009). A district court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Id.* at 678-79. A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference the defendant is liable for the alleged misconduct. *Id.* at 678.

## III.   ANALYSIS

### A.  The Statutory Text of the ADA

The ADA applies broadly to police "services, programs, or activities." 42 U.S.C. § 12132. The Ninth Circuit has interpreted these terms to encompass "anything a public entity does." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), rev'd in part on unrelated grounds, 135 S. Ct. 1765 (2015) (quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002). Accordingly, the ADA encompasses arrests, interviews, and investigations. The interaction between Plaintiff and Defendants was an interview and an investigation.

The ADA is similar in substance to the R.A., and "cases interpreting either are applicable and interchangeable." *Allison v. Department of Corrections*, 94 F.3d 494, 497 (8th Cir. 1996). To successfully state a claim under Title II of the ADA, a person "must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Bowers v. Nat'l Collegiate*

*Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3ᵈ Cir. 2007).

### 1. Plaintiff Is A Qualified Individual

The first question is whether persons subject to arrests, custodial detentions⁴ can be "qualified individuals" under the ADA, and they can, for there is nothing to categorically exclude them from the statute's broad coverage. *Gorman v. Bartch*, 152 F.3d 907, 912-13 (8ᵗʰ Cir. 1998) (concluding that an arrestee could be a qualified individual under the ADA despite not having "volunteered" to be arrested"); *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210-11 (1998) (noting that a state prisoner could be a "qualified individual" under the ADA even when participation in a service, program, or activity of the State is not voluntary). In applying Title II of the ADA to state prisons and prison services, Justice Scalia emphasized the broad language used by Congress and its choice not to include exceptions: State prisons "fall squarely within the statutory definition of 'public entity' since § 12131(1)B) defines public entity as 'any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id*. Accordingly, because of the broad nature of the ADA, Plaintiff is a qualified individual under the ADA.

### 2. Plaintiff, In Custodial Detention, Has A Disability Covered By The ADA

The second question is whether those held in custodial interrogations, as witnesses, and reasonably believing they are not free to leave, may have disabilities covered by the ADA, and the answer to that is clearly "yes." See 42 U.S.C. §12102(1). Like the overall population, the subset of people who are held in custodial interrogations, like those who are arrested, or are suspected of violating the law, will naturally include those with recognized disabilities. Plaintiff is disabled as

---

⁴ Plaintiff was held by Defendants in a custodial detention for the purpose of an interview relating to the shooting death of her estranged husband. Plaintiff was held in the midst of the investigation. Plaintiff at no time felt she was free to leave. Plaintiff had urgent need of a restroom and could not leave to utilize a restroom. Plainly, if Plaintiff was prohibited from using a restroom, she was not free to leave. (FAC, ECF 25, ¶23).

she has a terminal disease which interferes with several life activities such as working, driving, walking, and being able to take care of herself.

### 3. Plaintiff Was Subjected To Discrimination And Is Not Required to Prove Custodial Detentions are Services, Programs, Or Activities

The most difficult question pertinent to whether the ADA applies to custodial detentions or arrests is whether arrests made by officers are "services, programs, or activities of a public entity," **or** alternatively, whether officers may be liable under the ADA for "subjecting a qualified individual to discrimination" while effectuating an interrogation or arrest. 42 U.S.C. § 12132. This text contains the disjunctive clause "or be subjected to discrimination by any such entity." Several circuit courts have determined that this clause is "meant to be a 'catch-all phrase" that prohibits all discrimination by a public entity, regardless of the context. *Hamilton ex rel. J.H. v. City of Fort Wayne* (N.D. Indiana, 2017) (quoting *Seremeth v. Bd. Of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 338 (4ᵗʰ Cir. 2012); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9ᵗʰ Cir. 2002); *Reg'l Econ. Cmty Action Program v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002).

The text of the ADA is deliberately broad and police departments "fall 'squarely within the statutory definition of a "public entity."" *Gorman*, 152 F.3d at 912 (quoting *Yeskey*, 524 U.S. at 210); see 42 U.S.C. § 12131(1)(A)-(B) defining "public entity to include, among other things, "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government"). Furthermore, persuasive precedent indicates that the ADA's reference to "the services, programs, and activities of a public entity" should likewise be interpreted broadly "to encompass virtually everything that a public entity does." *Babcock v. Michigan*, 812 F.3d 531, 540 (6ᵗʰ Cir. 2016).

Because Section 12132 is framed in the alternative, Plaintiff is not required to prove whether Defendants conduct is a service, program, or activity. All that is necessary is to look to whether she

was "subjected to discrimination." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1084 (11ᵗʰ Cir. 2007) (concluding that the court did not need to decide "whether police conduct during an arrest is a program, service, or activity covered by the ADA" because a plaintiff "could still attempt to show an ADA claim under the final clause in the Title II state"). The "subjected to discrimination" phrase in Title II is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." *Bircoll*, 480 F.3d at 1085) (quoting *Bledsoe v. Palm Beach Cty, Soil and Water Conservation Dist.*, 133 F.3d 816, 821-22 (11ᵗʰ Cir. 1998)).

The *Bircoll* court held:

> We need not enter the circuits' debate about whether police conduct during an arrest is a program, service, or activity covered by the ADA. This is because Bircoll, in any event, could still attempt to show an ADA claim under the final clause in the Title II statute: that he was 'subjected to discrimination' by a public entity, the police, by reason of his disability. See 42 U.S.C. Section 12132. Indeed, this Court already has explained that the final clause of Section 12132 'protects qualified individuals with a disability from being subjected to discrimination by any such entity,' and is not tied directly to the services, programs, or activities, of the public entity. *Bledsoe v. Palm Beach County Soil & Water Conservation Dist.*, 133 F.3d 816, 821-22 (11ᵗʰ Cir. 1998). We said in Bledsoe that this final clause in Title II is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context. Id. at 822.

480 F.3d at 1084-85.

### 4. Defendants Arguments Regarding Whether Defendants Offered Plaintiff A Service, Program, Or Activity Are Irrelevant

Defendants' concerns with whether in interrogating Plaintiff they were offering Plaintiff a service, program, or activity is irrelevant. Plaintiff is not required to prove a service, program, or activity. Plaintiff has merely to prove that she was discriminated against by Defendants. For purposes of whether Defendants were required to accommodate Plaintiff under the ADA, Plaintiff need only establish Defendants failed to accommodate her disability. "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is

required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id*. The Court may ignore all arguments regarding services, programs, or activities.

**B. <u>Defendants Discriminated Against Plaintiff By Failing To Reasonably Accommodate Her Disability</u>**

"Discrimination includes a failure to reasonably accommodate a person's disability." *Sheehan* 743 F.3d at 1211 (9th Cir. 2014). *Sheehan* recognized two types of Title II claims stemming from arrests: (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees. *Sheehan*, 743 F.3d at 1232.

Plaintiff asserts the second type of Title II claim: That Defendants failed to reasonably accommodate her disability while investigated her husband's death. Plaintiff asserts Defendants denied her access to her medications and oxygen, denied her access to emergency medical care, and/or failed to provide her with her oxygen and medications for 14 hours. Plaintiff asserts reasonable accommodations could easily have been provided to safeguard her health and safety. "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

This conclusion, which is suggested by the wide scope of the ADA's text, has support in the Ninth Circuit and many circuits. See, *Sheehan,* 743 F.3d at 1217 ("Title II of the ADA applies to arrests."); *Roberts v. City of Omaha*, 723 F.3d 966, 973 (8th Cir. 2013) ("The ADA applies to law enforcement officers taking disabled suspects into custody."); *Gorman*, 152 F.3d at 912-13 ("The

ADA applies to persons transported to the police station. The Eighth Circuit decided that "the benefit' Gorman sought … was to be handled and transported in a safe and appropriate manner consistent with his disability). No court has held that the ADA does not apply to such situations.

### C.  Plaintiff's Disability Was The Cause of Her Harm

If Plaintiff had not been disabled, she would not have experienced harm. Plaintiff identifies two separate points at which she contends Defendants subjected her to discrimination by reason of her disability: First, the custodial detention inside the ambulance without her medications and oxygen. Second, the custodial detention at the SPD without her medications and oxygen. Plaintiff was placed into police custody immediately after the shooting of Johnny Bonta. While not accused of a crime, Plaintiff was not free to leave and not free to re-enter her apartment to gather her medications and oxygen.[5] Applying the law of the Ninth Circuit, Plaintiff was entitled to have an accommodation for her disability during this involuntary hold by law enforcement. The ADA mandates that public entities "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7). The ADA imposes upon public entities an **affirmative obligation** to make reasonable accommodations for disabled individuals to avoid discrimination on the basis of disability. *Bennett-Nelson v. Louisiana Board of Regents*, 431 F.3D 448, 454-55 (5th Cir. 2005). "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because the need is obvious or because the individual requests an accommodation." *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185 1196 (10th Cir. 2007).

### D.  Reasonable Alternatives Were Available To Accommodate Plaintiff's Disability

---

[5] Defendants expend considerable energy asserting Plaintiff was not detained, in custody, or subject to seizure. Such arguments miss the point. Plaintiff asserts only an ADA and R.A. violation, not a Fourth Amendment violation. It is of no meaningful significance whether she was in a custodial detention, subject to a seizure, or arrested. Plaintiff did not feel free to leave and remained subject to Defendant's show of authority and physical control.

Plaintiff contends reasonable accommodations would have allowed her to be interviewed without pain and suffering at no cost or inconvenience to Defendants or the investigation in progress.

(1) Defendants could have requested the REMSA officers already at the scene attending to the fatally shot Mr. Bonta to examine Plaintiff and make recommendations for her comfort, health and safety;

(2) Defendants could have requested REMSA officers working on Mr. Bonta to make oxygen in the ambulance, if it existed, immediately available to Plaintiff. If oxygen was available, REMSA personnel could have hooked Plaintiff to the oxygen. If there was no oxygen available, ambulance personnel could have called for additional personnel to bring oxygen to the scene;

(3) If the REMSA officers could not stop their work on Mr. Bonta and other REMSA officers were unavailable, Defendants could have taken Plaintiff to an emergency medical facility. Johnny Bonta was dead, Plaintiff was not a suspect. There was time for Defendants to transport Plaintiff to an emergency room prior to providing her statement;

(4) If Defendants did not wish to take Plaintiff to an emergency room, her adult children were available and could have taken Plaintiff to an emergency room;

(5) If Defendants did not wish to take Plaintiff to an emergency room, or would not permit Plaintiff's adult children to take Plaintiff to an emergency room, an additional ambulance could have been called to take Plaintiff;

(6) Defendants could have delayed Plaintiff's police interview until she had her medications and oxygen. It was not necessary for the officers to interview Plaintiff immediately. Plaintiff was a victim/witness. Plaintiff not accused of a crime. There was no pressing need for Plaintiff's immediate interview. The situation was stable. Plaintiff's husband was dead. SPD officers had killed him. There were no other bad actors at the scene. The crime scene evidence was under police control and adequate numbers of officers were present. No exigent circumstances existed that necessitated the immediate need for Plaintiff's interview—no evidence would be lost or destroyed—and no split-second decisions were necessary. There was time and opportunity to accommodate Plaintiff by delaying her interview until after she sought and received medical care and was medically stable.

Plaintiff contends she was entitled to these reasonable accommodations. Plaintiff maintains Defendants failed to make these reasonable modifications to their procedures to ensure her health

and safety thereby subjecting her to discrimination in violation of the ADA. Plaintiff contends Defendants were focused only upon their needs and their desire to complete their investigation. Plaintiff contends Defendants could not be bothered with her, or her disability, or her need for reasonable accommodation to avoid her serious risk of harm.

## IV.     OPPOSITION TO CITY OF RENO'S MOTION TO DISMISS

### A.  Plaintiff Has Established Deliberate Indifference To Her ADA Rights

City of Reno ("City") argues in its Motion to Dismiss, ECF No. 29, Plaintiff cannot establish discriminatory intent. City is wrong. City officers knew of Plaintiff's urgent need for medications and oxygen, knew Plaintiff was terminally ill with metastatic breast cancer, and knew she required medications and oxygen. City officers acted with deliberate indifference to Plaintiff's obvious risk of harm. Any person (including police officers) told of another's widespread metastatic cancer and terminal illness knows that medications and oxygen are necessary because it is **obvious.** Any person told of such conditions would understand the need for medications and oxygen is crucial, pressing, and imperative. Everyone knows, because it is common knowledge, that stage four metastatic cancer is a killer. Everyone knows the medical needs of a terminally ill person are not to be ignored.

"To show intentional discrimination, this circuit requires that the plaintiff show that a defendant acted with 'deliberate indifference,' which requires 'both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that …likelihood." *Updike v. Multnomah County*, 870 F.3d at 950-51. "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id*.

To meet the second prong, the entity's failure to act "must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id*. In this matter, Plaintiff alerted Defendants multiple times of her need for her medication and oxygen. Defendants, ignored, disregarded, and   trivialized her concerns—treating Plaintiff as garbage. Defendants, whose absolute duty is to protect and serve, had nothing but contempt for Plaintiff's serious risk of harm, as if her health and safety was of no concern.

Defendants did to Plaintiff what historically has been done to all disabled people—they ignored her. The totality of the circumstances establishes Defendants acted with deliberate indifference—they knew of a risk of harm to Plaintiff because it was obvious and intentionally disregarded that risk—they were only concerned with their own investigation, their own business, and their own activities. Plaintiff's concerns were inconsequential, a minor, petty, trifling, negligible irritant Defendants felt free to ignore. Defendants failed to conduct a fact specific inquiry into Plaintiff's risk of harm because Defendants were deliberately indifferent to Plaintiff's risk of harm. It was of no consequence to them.

**B.  Defendants Failed To Make A Fact Specific Inquiry To Consider Plaintiff's Needs**

Defendants were required to make a fact specific inquiry into whether Plaintiff required an accommodation. "It is well-settled that Title II and Section 504 create a duty to gather sufficient information from the disabled individual and qualified experts as needed **to determine what accommodations are necessary.** Thus, a public entity '**must consider the particular individual's need'** when conducting its investigation into what accommodations are reasonable." *Updike v. Multnomah County,* 870 F3d at 951. (Emp. Added). When an entity is on notice of the need for accommodation, it 'is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation." *Id*. "A public entity may not disregard the plight and

distress of a disabled person." *Id*.

Defendants, in complete disregard for Plaintiff's disability, failed to conduct an investigation into what accommodation Plaintiff required—fact specific or otherwise. Defendants knew Plaintiff required her medication and oxygen, knew Plaintiff was terminally ill, and knew the nature of Plaintiff's disability. Defendants should have asked Plaintiff: "What will happen if your oxygen and medications are delayed?" "Will you get sick if you are temporarily without your medications and oxygen?" "Do you have an alternative source of medications and oxygen?" "Do you need to go to an emergency room?" "What can we do to ensure your health is not at risk during our questioning?" Defendants should have told Plaintiff that she needed to provide a statement and to answer questions but she did not have to do it immediately.

Defendants knew from repeated entreaties that Plaintiff was in urgent need of her medications and oxygen. There was nothing to prevent Defendants from making an inquiry into Plaintiff's need for these items. There was no current emergency and no exigent circumstances to prevent an inquiry into how Plaintiff would suffer from a temporary cutoff of her medications and oxygen: 1) The sole bad actor, Johnny Bonta, was dead; 2) There were no other suspects or victims; 3) The crime scene was contained; 4) There were no split second decisions to be made; 5) The action was over; 6) All that remained was to take interviews and write reports. This is not to say that taking interviews and writing reports is not important, it is. However, there was time and opportunity to make a reasonable inquiry of Plaintiff's risk of harm in going without her medication and oxygen. There was time and opportunity to suspend her interview until she obtained her medication and oxygen and was stabilized. There was time and opportunity to consider Plaintiff's risk of harm.

### C. **Plaintiff Asserted Her Need For Oxygen And Medications 15 Times**

City argues deliberate indifference does not occur "where a duty to act may simply have been overlooked." (City's Br. ECF 29, 4:15-17). This is far from the case. Plaintiff and others on Plaintiff's behalf asserted Plaintiff's need for oxygen and medications **15 times**. Plaintiff and others described the Plaintiff's needs as urgent:

- First, Plaintiff's adult daughter Jill Gonzalez explained an RPD officer on the scene while Plaintiff was confined inside the ambulance that "her mother was terminally ill with stage 4 metastatic breast cancer and had urgent need for her medications and oxygen (FAC, ECF 25, ¶ 14);

- Second, Plaintiff's adult daughter Bryce Mower told an RPD officer Plaintiff was sick, had cancer, and needed her oxygen and medications (FAC, ECF 25, ¶ 19);

- Third, at 5:00 a.m., Plaintiff asked the officer for her medications and oxygen. Plaintiff explained her illness and the nature of her illness that she is terminally ill with stage 4 breast cancer and on oxygen 24/7 and in urgent need of her oxygen and medications (FAC, ECF 25, ¶ 20);

- Fourth, at 6:00 a.m. Plaintiff again asked for her medications and oxygen (FAC, ECF 25, ¶ 22);

- Fifth, at about 7:00 a.m., Plaintiff again explained to RPD officer McQuattie that she is a stage 4 breast cancer patient, terminally ill, and required her medications and oxygen (FAC, ECF 25, ¶ 24);

- Sixth, at about 7:15 a.m., Plaintiff again explained to McQuattie where her medications were (FAC, ECF 25, ¶ 25);

- Seventh, at about 8:00 a.m., Plaintiff asked WCSO Detective McVickers, about her medications and her need for them (FAC, ECF 25, ¶ 26);

- Eighth, at about 8:15 a.m., Gonzalez and Mower asked RPD officers if they could retrieve Plaintiff's medications and oxygen because she needed them (FAC, ECF 25, ¶ 30);

- Ninth, at about 8:15 a.m., Mower spoke with another RPD officer, saying "My mom is terminally ill and needs her medications and oxygen, can you please get it for her. My mom did nothing wrong, she needs her oxygen and medication (FAC, ECF 25, ¶ 31);

- Tenth, Gonzalez pleaded with an RPD officer to bring her mother's tote with her medications, her purse and her oxygen (FAC, ECF 25, ¶ 32);

18

- Eleventh, between 8:30 a.m. and 9:00 a.m., Gonzalez told Officer Buell Plaintiff has cancer and needs her medications and oxygen (FAC, ECF 25, ¶ 33);

- Twelfth, at about 10:15 a.m., Mower told Buell he thought someone would be bringing Plaintiff's medications and oxygen (FAC, ECF 25, ¶ 34);

- Thirteenth, about 10:30 or 11:00 a.m., Gonzalez asked Buell again for Plaintiff's medications and oxygen, explaining the items were urgently needed (FAC, ECF 25, ¶ 35);

- Fourteenth, about 10:30 or 11:00 a.m., Plaintiff asked "How long before I can get my medications and oxygen?" (FAC, ECF 25, ¶ 35);

- Fifteenth, about 11:30 a.m., Plaintiff told Buell exactly where the oxygen and medications were located in her apartment (FAC, ECF 25, ¶ 36).

Because Plaintiff asserted her need for her medications and oxygen 15 times, it is unreasonable for City to claim it merely "overlooked" her need for accommodation. (City's Br., ECF 29, 4:15-16). City's claims that it "missed" Plaintiff's pleading and entries is without merit.

### D. **Plaintiff Was Led To Believe Her Medications And Oxygen Would Be Momentarily Supplied And She Would Be Accommodated – Plaintiff Continued To Cooperate Because of Defendants' False Assurances**

City claims it did not deny Plaintiff a reasonable accommodation because she was focused on obtaining her oxygen and accommodation from her property and "did not ask to go to a hospital." (City's Br. ECF 29, 5:15-26 and 6:1-16). This argument fails because Defendants **insisted** and **assured** Plaintiff that any moment her medications and oxygen would be provided from her **property**. Plaintiff had no reason to go to a hospital because Defendants pledged, promised and agreed to provide her oxygen and medications. Plaintiff had no reason run urgently to a hospital because Plaintiff trusted Defendants to do what they assured her would be done. Plaintiff trusted Defendants. Plaintiff believed Defendants were there to serve and protect. Plaintiff was entirely reasonable in relying on Defendants. Good citizens rely on law enforcement. Good citizens trust law enforcement officers. Responsible citizens depend on the honesty and integrity of law

enforcement and society encourages them to do so.  Accordingly, Plaintiff did not ask to suspend the questioning to go to a hospital because she relied on and believed the numerous officer statements that her request for medication and oxygen would be soon accommodated.

**E.  Defendants Deceived Plaintiff Into Believing Her Oxygen And Medications Would Be Momentarily Supplied**

If Defendants had honestly stated: "Your medications and oxygen are contained inside your apartment and your apartment is now a crime scene. We will not be able to allow you in. We will not be able to extract those items for you," Plaintiff would have immediately requested to go to an emergency room. Plaintiff, like all citizens, relied on the honesty and professionalism of law enforcement. Plaintiff was not required to say: "I don't believe you. I don't think you will provide me with the items I require, take me to a hospital or let me leave now to seek medical care." Plaintiff was reasonable in relying on Defendants repeated assertions that her medications and oxygen would be supplied and, on their way, momentarily. The following examples outline the assurances provided to Plaintiff:

- First, at about 5:00 a.m., when Plaintiff explained her need for medications and oxygen, an officer told her, "An officer will come and speak to her." This reasonably led her to believe her concerns would be addressed—there was no need to ask to go to a hospital (FAC, ECF 25, ¶ 20);

- Second, at about 6:00 a.m., the ambulance door was again opened by an RPD officer. Plaintiff explained her need for her medications and oxygen and was told by the officer, "We will get someone." Plaintiff was reasonable in believing her concerns would be addressed and there was no need to ask to go to a hospital (FAC, ECF 25, ¶ 22);

- Third, at about 6:45 am., RPD detective McQuattie opened the ambulance door. After hearing Plaintiff's request for oxygen and medications, McQuattie assured Plaintiff that "everything needed" would be provided at SPD (FAC, ECF 25, ¶ 23);

- Fourth, at about 7:00 a.m., McQuattie opened the ambulance door again. After hearing again, the urgency of Plaintiff's need for medications and oxygen said, "Everything will be provided at SPD." This naturally led Plaintiff to believe her needs would be provided and there was no reason to ask to go to a hospital (FAC,

ECF 25, ¶ 24);

- Fifth, at about 7:15 a.m., McQuattie after listening again to Plaintiff's needs said: "I'll see what I can do." This led Plaintiff to believe her medications and oxygen would be provided (FAC, ECF 25, ¶ 25);

- Sixth, at about 8:00 and continuing for the duration of Plaintiff's interview with RPD officer McQuattie and WCSO McVickers, Plaintiff continued to ask for her medications and oxygen. McVickers said, "I'll see what I can do. I'll make some calls to people at the crime scene and we'll see what we can do." (FAC, ECF 25, ¶ 26);

- Seventh, at about 8:30 to 9:00, Gonzalez and Mower begged Buell for Plaintiff's oxygen and medications. Buell replied: "We're working on it. We're going to get someone to bring her stuff." This reasonably led both Gonzalez and Mower to believe Plaintiff's oxygen and medications would be provided at any minute (FAC, ECF 25, ¶ 33;

- Eighth, at about 10:15 a.m., Buell instructed Gonzalez and Mower that: "We're working on it." The statement "we're working on it" was meant to convey the medications and oxygen would be promptly provided and Plaintiff and her children were entitled to rely on it and not ask to be transported to the hospital (FAC, ECF 25, ¶ 34);

- Ninth, at about 10:30 or 11:00 a.m., Plaintiff was finished with her interview and again pleaded for her oxygen and medication. Buell said, again, he would "work on it." Buell said he would "make some calls as soon as Marissa's interview was finished. Since Plaintiff had no idea how long Marissa's interview would last, Plaintiff requested the interview be ended immediately (FAC, ECF 25, ¶ 35). Plaintiff was reasonable to believe that the items would be provided to her immediately after Marissa's interview concluded.

- Tenth, at about 11:30, Plaintiff ended Marissa's interview. Buell asked Plaintiff for exactly what she needed and made a list. Plaintiff told Buell where her oxygen was and where her medications were located and Buell wrote it down. Buell said he would make a call and see what he could do to have the items delivered to SPD (FAC, ECF 25, ¶ 36). Plaintiff was reasonable in thinking that the items would be momentarily provided. Plaintiff believed at any moment her oxygen and medications would be provided. (FAC, ECF 25, ¶ 36).

**F.  Plaintiff Did Not Feel She Was Free To Leave And Obtain Medical Care**

City argues it had no duty to accommodate Plaintiff because she was never in custody and never detained. (Def. Br. ECF 29, 4:24-26). City claims if *Sheehan* applies, it applies only to arrestees and Plaintiff was never arrested, detained, or in custody therefore Reno officers were not

required to provide ADA protections. Whether Plaintiff was seized, detained, or in a custodial detention is a question of fact—what remains without dispute is Plaintiff felt she was not free to leave. If she felt free to leave she would have left, gone to an emergency room, or to her doctor, and obtained some type of temporary oxygen and medications while awaiting permission to reenter her apartment.

"Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go on about his business, the encounter is consensual.'" *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission." *Brendin v. California*, 551 U.S. 249, 254 (2007). "When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not." *Id*. The test was devised by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544, (1980) who wrote that a seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id*.

The factual question presented is whether Plaintiff reasonably felt she was not free to leave—whether Plaintiff felt police officers were exercising control to the point that she was not free to assert her desire to go to a hospital or to her doctor's office while prohibited from entering her apartment to obtain her medications and oxygen. It is reasonable for persons present at the scene of a crime, or a shooting investigation, to believe their freedom to move around may be constrained. A death is a serious event. Defendants were not discussing ice cream cones or missing keys from a

jacket pocket. Due to the gravity of the event, Plaintiff was all the more reasonable in feeling she was not free to leave. In *Maryland v. Wilson*, 519 U.S. 408 (1997) and other related opinions, the United States Supreme Court has held it is permissible during a lawful traffic stop for an officer to order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk. "In fashioning this rule, we invoked our earlier statement that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Brendin v. California*, 551 U.S. 249 at 258. "What we have said probably reflects a societal expectation of 'unquestioned police command' at odds with any notion that a passenger would feel free to leave, or to terminate the  personal encounter any other way, without advance permission. "*Id*. Plaintiff was not a passenger, but she was a witness of a shooting death. Reasonable people in such circumstances would believe they would not be free to leave until given express permission.

### G. Proof That Plaintiff Did Not Feel She Was Free To Leave Is Demonstrated In The Denial of Her Urgent Request to Use The Bathroom

Plaintiff's husband had just been shot. Police were swarming Plaintiff's apartment and the grounds outside the apartment. Plaintiff was in shock. The police were exhibiting absolute control of the scene. In the midst of this circumstance, Plaintiff responsibly and immediately followed police commands to enter an empty ambulance and await further instruction. No reasonable person under the circumstances in Plaintiff's position would have done otherwise. As a good citizen, Plaintiff wanted to be cooperative. Plaintiff remained in the ambulance, with the door closed, with her daughter and service dog until approximately 5:00 a.m. when the ambulance door was opened, and she asked for her medications and oxygen. (ECF No. 25, ¶ 20.) Plaintiff was told an officer would come and speak to her. (*Id*.) Plaintiff did not feel she was free to question the officer or to assert her desire to leave the scene and to walk away but she did make clear she required her

medications and oxygen. Plaintiff remained in the ambulance another hour, until approximately 6:00 a.m. when the ambulance door opened again and Plaintiff again requested her medications and oxygen. (*Id*. ¶ 22). Plaintiff remained in the ambulance another 45 minutes, until approximately 6:45 a.m. when the ambulance door was again opened, this time by RPD Detective McQuattie who asked for Plaintiff's  name and social security number. Plaintiff, anxious, upset, in pain, was also in urgent need of a bathroom. (*Id*. ¶ 23.  )  McQuattie explained to Plaintiff that she and her daughter would be taken to SPD where "everything they needed would be provided." (*Id*. ¶ 23.)  **Obviously, if Plaintiff felt she was free to leave, she would have immediately taken herself to the nearest bathroom.** No one with urgent need of a bathroom would reasonably choose to remain closeted in a closed ambulance. If Plaintiff felt free to leave the ambulance, she would have left to find her own bathroom.

## V.   OPPOSITION TO WASHOE COUNTY'S MOTION TO DISMISS

### A.   Washoe County Makes The Identical Arguments Made By City of Reno

Washoe County ("County") makes the identical arguments made by City. County states: "Since Washoe County did not arrest her, Bonta was free to leave." (Def. Br. ECF 28, 5:19-20). Plaintiff as argued above was locked in an ambulance, taken to SPD, interviewed extensively by both City and County officers. Under the show of authority by law enforcement she was entirely reasonable in believing she was not free to leave. No reasonable person in Plaintiff's position would feel free to leave.

County states, Plaintiff made "the decision to stay and to not seek medical treatment." (Def. Br. ECF 28, 5:20-22). Plaintiff was rushed into an ambulance and locked inside. Plaintiff had no idea what to expect. Certainly, she did not expect law enforcement to deny her access to her medications and oxygen. Any reasonable person seeing their husband fatally shot by officers would be in shock, even if the death was justifiable. Plaintiff was reasonable in wanting to cooperate  with

law enforcement and reasonable in following their directives. All citizens have a duty to cooperate with law enforcement. If Plaintiff had left, she would be subject to possible charges—obstructing justice for starters.

County's arguments are disingenuous. For example, County states: "Bonta fails to provide an explanation for her estranged husband's behavior."  (Def. Br. ECF 28, ¶ 23-26). It is plainly not relevant why her estranged husband was waving a gun around and threatening her or her daughter. Plaintiff has never stated, nor does she know, why her husband elected to behave in such a threatening manner. Plaintiff is not challenging her husband's death. Nor is Plaintiff challenging the Defendants' right to interview her. However, in conducting the expected interview, Plaintiff reasonably expected Defendants would not subject her to a severe risk of harm.

### B.     Plaintiff Is Not Bringing A Motion For Injunctive Relief

Plaintiff has filed a First Amended Complaint and not a Motion For Injunctive Relief. County expends considerable energy outlining the requirements for a Motion For Injunctive Relief and Plaintiff's case apropos injunctive (County's Br., ECF 28, 10:19-26; 11:1-16). Plaintiff respectfully requests County's misplaced irrelevant argument on a matter not currently before the Court.

### C.     *Hainze v. Richards* Has No Application To This Matter

Ignoring overwhelming Ninth Circuit precedent and failing to mention the important Ninth Circuit  2017 Title II case of *Updike v. Multnomah County*, County focuses instead on an 18 year old out of circuit case from Texas, *Hainze v. Richards,* 207 F.3d 795 (5th Cir. 2000). The Ninth Circuit has made clear in *Sheehan v. City & Cty. of San Francisco,* that the ADA applies to arrests and "anything a public entity does." Other circuits and the United States Supreme Court, as cited above, have repeatedly emphasized the broad application of the ADA. See also *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016).

 The ADA mandates that public entities "shall make reasonable modifications in policies, practices, or procedures when the modifications **are necessary** to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7) (Emp. Added). What this means is if it is possible to avoid

discrimination on the basis of disability, officers have an affirmative obligation to do so. The ADA imposes upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals to avoid discrimination on the basis of disability. This does not mean that officers must sacrifice their lives in order to avoid discrimination against the disabled.

*Hainze* concerned a mentally ill individual with a history of depression armed with a knife at a convenience store. Hainze issued profanities and threatened deputies. As Hainze approached the officers, with a knife in hand, the deputies twice ordered Hainze to stop but Hainze ignored them. When Hainze was within four to six feet, a deputy fired two shots. Hainze survived and brought a civil lawsuit alleging violations of his Fourth and Fourteenth Amendment rights as well as an ADA/Section 504 claim. The court held that the officers did not have to accommodate Hainze's mental disability during the arrest process. The Hainze decision is correct. The deputies faced a serious officer safety issue. Hainze was a deranged individual menacing them with a deadly weapon. The deputies were correct in protecting themselves. It would have been disastrous for the deputies to consider Hainze's alleged mental illness and ADA rights while he frightened and threatened them with a knife. The officers, in the midst of a life and death struggle, were not required to sacrifice their lives to protect Hainze's ADA rights. When the ADA mandates that public entities "shall make reasonable modifications in policies, practices, or procedures **when** the modifications **are necessary** to avoid discrimination on the basis of disability, it means precisely that.  Modifications and consideration of ADA rights are not necessary when a violent suspect is threatening to kill the arresting officers. Nothing could be more inapposite to the case at bar than the Hainze case.

**VI.    WHAT DEFENDANTS DO NOT CONTEST**

Defendants do not contest the following:

(1)    That Plaintiff is disabled within the meaning of the ADA;

(2)    That Plaintiff is terminally ill with stage 4 metastatic breast cancer and on oxygen 24 hours a day;

(3)    That Plaintiff notified Defendants of her need for her oxygen and medications;

(4)     That Plaintiff's adult children notified Defendants of Plaintiff's need for her medication and oxygen;

(5)     That by notifying Defendants of Plaintiff's need for her medication and oxygen Plaintiff was asking for a reasonable accommodation;

(6)     That Plaintiff was not accused of a crime or suspected of wrongdoing;

(7)     That there was an urgency to questioning Plaintiff immediately after the shooting death of Johnny Bonta.

(8)     That Plaintiff was led to believe her oxygen and medications would be furnished by Defendants momentarily;

(9)     That there was a pressing need for Plaintiff's interview to take place immediately after her husband's shooting by SPD officers;

(10)    That Plaintiff's interview could have taken place after Plaintiff was stabilized with her oxygen and medications, a day or two later;

(11)    That Plaintiff was in excruciating pain during her time in the ambulance, at the police interviews, and for nearly one week thereafter; and,

(12)    That Plaintiff's harm was caused by Defendants' failure to accommodate her reasonable request for accommodation.

## VII.   PLAINTIFF WITHDRAWS HER NEGLIGENCE CLAIM

Upon reflection, Plaintiff withdraws her negligence claim. Plaintiff contends the conduct alleged was a result of a deliberate intentional act and does not wish to plead in the alternative.

## VIII.   CONCLUSION

Defendants motions should be denied because almost all of Defendants' arguments are rooted in questions of fact. The ADA applies broadly to police "services, programs, or activities." 42 U.S.C. § 12132. The Ninth Circuit has interpreted these terms to encompass "anything a public entity does." Accordingly, the ADA encompasses arrests, interviews, and investigations. It is beyond dispute that Defendants are public entities. It is beyond dispute that Defendants held

Plaintiff for extended questioning with notice of her disability and urgent need for medications and oxygen. It is likewise beyond dispute that Plaintiff made reasonable requests for an accommodation to prevent a serious risk of harm and Defendants were deliberately indifferent to her requests.

For all of these reasons, Plaintiff respectfully requests Defendants' Motion to Dismiss be denied.

DATED:  September 5, 2018

By: __/s/__ Terri Keyser-Cooper____
TERRI KEYSER-COOPER
*Attorney for Plaintiff Lisa Bonta*

# CERTIFICATE OF SERVICE

I, Terri Keyser-Cooper, declare as follows:

I am over the age of 18 years and not a party to this action. My business address is 3590 Barrymore Dr., Reno NV 89512

On this date, I served a copy of the following documents on the parties in this action as follows:

PLAINTIFF'S OPPOSITION TO DEFENDANTS MOTION TO DISMISS

[ ]     BY UNITED STATES MAIL.  By placing a true copy of the above-referenced document(s) in the United States Mail in a sealed envelope with postage prepaid to the addressee(s) listed below.

[ ]     BY FACSIMILE TRANSMISSION.  By transmitting a true copy of the document(s) by facsimile transmission

[ ]     BY HAND-DELIVERY.  By delivering a true copy enclosed in a sealed envelope to the address(es) shown below.

[x ]     BY ELECTRONIC SERVICE.  By electronically mailing a true copy of the document(s) to defendants at the following email addresses via the Court's electronic filing procedure:

CHRISTOPHER J. HICKS
WASHOE COUNTY DISTRICT ATTORNEY
Keith Munro
P.O. Box 11130
Reno, NV 89520-0027

KARL HALL
RENO CITY ATTORNEY
Mark Hughs
Mark Dunagan
P.O. Box 1900
Reno, NV 89505

I declare under penalty of perjury that the foregoing is true and correct.

DATED: September 5, 2018          /s/ Terri Keyser-Cooper
                                   TERRI KEYSER-COOPER