# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

LISA BONTA,

    Plaintiff,

vs.

WASHOE COUNTY et al.,

    Defendants.

3:18-cv-00012-RCJ-WGC

**ORDER**

This case arises out of the treatment of a disabled witness by first responders at the scene of a shooting. Pending before the Court are two motions to dismiss, a motion to substitute parties, and a motion to lift the stay of discovery.

## I.    FACTS AND PROCEDURAL HISTORY

In the early morning hours of October 22, 2017, Plaintiff Lisa Bonta's estranged husband Johnny was shot dead by police after a night of drinking in and around Plaintiff's apartment. (Compl. ¶¶ 6–10 & n.2, ECF No. 1). The shooting itself is not the basis of the lawsuit, but rather Plaintiff's treatment by personnel at the scene.

At or about 4 a.m., Plaintiff, her service dog, and her 16-year-old daughter Marissa were "hurried into a nearby ambulance." (*Id.* ¶ 11). Marissa called her 33-year-old sister Jill to inform her of the situation, and when Jill arrived, a Reno Police Department ("RPD") officer told her

Plaintiff and Marissa were in the ambulance. (*Id.* ¶ 12). Jill explained that Plaintiff had stage 4 breast cancer and needed her medications and oxygen, and the officer told her there was oxygen in the ambulance. (*Id.*). Another RPD officer told Jill she had to leave the area, so she did. (*Id.*). Also at or about 4 a.m., Plaintiff called her son Bryce to inform him of the situation, and when he arrived at about 4:50 a.m., he told an RPD officer he was there to check on his mother, explaining her medical situation, to which the officer replied that it was an active crime scene, so he couldn't give Bryce any information. (*Id.* ¶ 14). Bryce left, as instructed by the officer, and called Jill to discuss the situation. (*Id.*).

At or about 5 a.m., Plaintiff told an officer she needed her medications and oxygen, and he said another officer would come speak to her. (*Id.* ¶ 15). At or about 6 a.m., she made another request for her medications and oxygen, and an "official" told Plaintiff, "We will get someone." (*Id.* ¶ 17). By then, Plaintiff was in physical distress and extreme pain; her muscles were cramping from lack of oxygen, she was cold and barefoot without a coat, and her morphine pain pump was in her apartment. (*Id.* ¶ 17). At about 6:45 a.m., RPD Detective McQuattie asked for Plaintiff's and Marissa's names and social security numbers and explained they would be taken to Sparks Police Department ("SPD") to receive "everything they needed." (*Id.* ¶ 18). He repeated this assurance when Plaintiff asked for her medications and oxygen again at about 7 a.m. (*Id.* ¶ 19). They arrived at the SPD station at about 7:15 a.m., and after 30–45 minutes, McQuattie told Plaintiff nothing could be removed from the apartment for up to 24 hours but he would see what he could do. (*Id.* ¶ 20).

At about 8 a.m., Washoe County Sheriff's Office ("WSCO") Detective McVickers introduced himself to Plaintiff and Marissa and took Plaintiff away separately for questioning. (*Id.* ¶ 21). Plaintiff asked him about her medications and oxygen, and McVickers replied that

nothing could be removed from the apartment for up to 24 hours but he would see what he could do. (*Id.* ¶ 21). McVickers and McQuattie then interviewed Plaintiff for 2–3 hours. (*Id.* ¶¶ 21, 24). When asked about Plaintiff's oxygen and medications, they repeated that nothing could be removed from the apartment for up to 24 hours but they would see what they could do. (*Id.* ¶ 24). Jill and Bryce were refused entry to the apartment by police at about 8:15 a.m. because it was an active crime scene. (*Id.* ¶¶ 25–27). When Jill and Bryce arrived at SPD, they contacted WSCO Officer Buell, as instructed at the scene, and he told them Plaintiff was being interviewed and that they were working on getting someone to bring the medications and oxygen, but nothing had been done by the time Plaintiff finished her interview at 10:30 or 11 a.m. (*Id.* ¶¶ 27–30). At that time, Plaintiff told Buell exactly which items were needed and where they were in the apartment, and Buell said he would make some calls once Marissa's questioning was done. (*Id.* ¶ 30). When Marissa's interview was done at about 11:30 a.m., McVickers took this information from Plaintiff, as well, and said he would make a call. (*Id.* ¶ 31).

Plaintiff went to Bryce's house to rest, and Jill stayed at the SPD station to wait for her mother's items. (*Id.* ¶ 32). At about 12:45 p.m., an RPD officer gave Jill a paper bag with dirty clothes and Plaintiff's purse but no medications or oxygen, telling her she would get the other things when she got the keys to the apartment, which could be up to 24 hours. (*Id.*). Jill received a call from SPD at about 5 p.m. informing her she could retrieve the keys to the apartment. (*Id.* ¶ 33). Jill and her mother arrived at the apartment at about 6 p.m. (*Id.*).

Plaintiff sued Washoe County ("the County") and the City of Reno ("the City") for failure to accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act ("RA"), 29 U.S.C. § 794. The County and the City separately moved to dismiss. The Court granted the motions and in so doing: (1) rejected Defendants' arguments

under the *Younger* abstention doctrine; (2) ruled that Plaintiff could state no claim based on an alleged failure to involve her more closely in the investigation; (3) ruled that refusing to permit Plaintiff to enter the crime scene to retrieve medications or equipment was not unlawful, and that Plaintiff had not sufficiently alleged having been denied assistance in the ambulance; and (4) permitted Plaintiff to amend to allege that Defendants had failed to accommodate her medical needs generally when asked. Plaintiff filed the FAC, and the County and the City have again separately moved to dismiss.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency, *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983), and dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A court treats factual allegations as true and construes them in the light most favorable to the plaintiff, *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986), but does not accept as true "legal conclusions . . . cast in the form of factual allegations." *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1071 (9th Cir. 2009). A plaintiff must plead facts pertaining to his case making a violation "plausible," not just "possible." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). That is, a plaintiff must not only specify or imply a cognizable legal theory (*Conley*

review), he must also allege the facts of his case so that the court can determine whether he has any basis for relief under the legal theory he has specified or implied, assuming the facts are as he alleges (*Twombly-Iqbal* review).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion. However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted). Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Also, under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record" if not "subject to reasonable dispute." *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011). Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

### III. ANALYSIS

The substantive standards are the same under the RA and the ADA. *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045, n.11 (9th Cir. 1999).[1] The RA applies to entities that receive federal financial assistance, and the ADA applies to public entities. Neither the City nor the County appear to argue that either statute is inapplicable to it as a general matter.

---

1 Plaintiff listed a claim for negligence in the FAC without leave but has withdrawn the claim via the response to the present motions to dismiss.

> To state a claim of disability discrimination under Title II, the plaintiff must allege four elements: (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). Defendants do not appear to argue that Plaintiff did not have a disability, i.e., cancer, which required medications and oxygen. Nor do they appear to dispute that Plaintiff was "otherwise qualified" to participate in any of their "services, programs, or activities." The dispute is over whether Plaintiff was excluded from any "services, programs, or activities" or otherwise discriminated against because of her disability.

Plaintiff alleges the ambulance that she, her service dog, and Marissa were taken to was empty of medical personnel; the paramedics were outside the ambulance trying to save Johnny's life. (First Am. Compl. ¶ 12, ECF No. 25). Plaintiff scanned the ambulance for oxygen but could not see any. (*Id.* ¶ 13). When Jill arrived and explained to a police officer that Plaintiff needed her medications and oxygen, the officer told Jill there was oxygen in the ambulance but took no further steps to ensure Plaintiff had access to oxygen. (*Id.* ¶¶ 14–15). When Bryce later arrived at the scene, he also explained to a police officer that Plaintiff needed her medications and oxygen, but the officer told him to leave the scene. (*Id.* ¶ 19). At about 5 a.m., a police officer opened the ambulance door; Plaintiff told him she needed her medications and oxygen; and he told her another officer would speak to her about it. (*Id.* ¶ 20). The same thing happened at about 6 a.m. (*Id.* ¶ 22). At about 6:45 a.m., Detective McQuattie asked for Plaintiff and Marissa's information and said everything they needed would be given to them at the SPD station. (*Id.* ¶ 23). At about 7 a.m., McQuattie again opened the ambulance door; Plaintiff told him she needed her medications and oxygen; and he told her everything she needed would be given to them at

the SPD station. (*Id.* ¶ 24). They arrived at the SPD station at about 7:15 a.m., but despite repeated requests for medication and oxygen, Plaintiff was given no medical assistance and was not permitted to reenter her apartment until 6 p.m., fourteen hours after being taken to the ambulance. (*Id.* ¶¶ 25–38).

Plaintiff does not allege that she was unable to participate in the investigation as any other person would have been. She has not alleged, for example, that persons without her disability would have been permitted to reenter the scene of the homicide more quickly, or that they would have been treated differently in the ambulance or at the police station. Rather, she complains that Defendants did not take reasonable steps to accommodate her disability, i.e., give her the oxygen and medications (whether Defendants obtained them from her apartment or elsewhere) that she made clear her disability necessitated. That theory is valid under Title II of the ADA:

> More generally, Title II imposes upon public entities a "duty to accommodate" disabled persons. Even facially neutral government actions that apply equally to disabled and nondisabled persons may violate Title II if the public entity has failed to make reasonable accommodations to avoid unduly burdening disabled persons. For this reason, poorly maintained public sidewalks may be a form of discrimination proscribed by Title II. Obstructed sidewalks exclude disabled persons from ordinary communal life and force them to risk serious injury to undertake daily activities. This is precisely the sort of "subtle" discrimination stemming from "thoughtlessness and indifference" that the ADA aims to abolish.

*Cohen v. Culver City*, 754 F.3d 690, 700 (9th Cir. 2014) (citations omitted) (reversing summary judgment where the plaintiff alleged a Title II violation based on the city's failure to ensure a public vender did not block a curb ramp, causing him to trip when he tried to ascend the curb). Plaintiff alleges that the failure to accommodate her medical needs caused unnecessary pain and suffering for several hours while she was held in the ambulance and questioned at the SPD station.

The Court agrees that whether Plaintiff was detained appears to remain a question of fact; she alleges facts indicating she did not feel free to leave. And the Court is not certain this even matters. Defendants compare Plaintiff's time in the ambulance and the SPD station to an arrest and argue that unless Plaintiff was forcibly detained, Title II was not applicable because there were no "services, programs, or activities" at issue. But an arrest is only one potential interaction with a public entity triggering Title II coverage, even where the public entity is a law enforcement entity. If Defendants provided the ambulance as a place for Plaintiff and her children to rest during the incident (just as Defendants would presumably have provided to anyone under the circumstances), that is a service triggering the reasonable accommodation requirement. The same is true of Plaintiff's interview at the SPD station. It doesn't matter that Plaintiff may have been free to leave to seek medical attention on her own any more than it might have mattered that the plaintiff in *Cohen* might have been free to walk around the block to avoid the curb or ask someone to lift him over it. The point of the reasonable accommodation requirement is that a disabled person needn't (within reason) go to extra lengths to participate in the relevant public service or activity. The ADA is designed to abolish this kind of "subtle discrimination." *Cohen*, 754 F.3d at 700. Whether it was unreasonable to expect oxygen and/or medications to be provided at the scene or at the SPD station is a mixed question of law and fact for summary judgment or a jury.

It is true that to obtain money damages under Title II of the ADA or the RA, "a plaintiff must prove intentional discrimination on the part of the defendant," i.e. "deliberate indifference," meaning "both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138–39 (9th Cir. 2001). In order to satisfy the first element of the deliberate indifference test in this context,

a plaintiff must "alert[] the public entity to his need for accommodation." *Id.* at 1139. Plaintiff has alleged both notifying Defendants of her disability-based need for oxygen and medications and Defendants' failure to take any action to assist her in obtaining them (again, whether from her apartment or elsewhere).

The Court finds that Plaintiff has sufficiently stated ADA and/or RA claims against Defendants on a failure-to-accommodate theory, based on RPD and WSCO personnel failing to provide oxygen and medication in the ambulance and at the SPD station when requested, respectively. Accordingly, the motions to dismiss are denied, and the stay of discovery pending resolution of the motions to dismiss is lifted.

Finally, Plaintiff has asked the Court to substitute two of her adult children as parties in her place. As noted, Plaintiff has a terminal illness, and she has now entered hospice care. Her mental competence varies from day-to-day. If a party is determined to be incompetent under Rule 25, a federal court may appoint a representative, such as a *guardian ad litem*, under Rule 17, so long as none has yet been appointed under state law. *Hulstedt v. City of Scottsdale*, No. CV-09-1258, 2011 WL 772387, at * 2 (D. Ariz. Mar. 1, 2011) (citing *Estate of Escobedo v. Redwood City*, No. C03-03204, 2006 WL 571354, at * 7 (N.D. Cal. Mar. 2, 2006) (citing *Hanna v. Plumer*, 380 U.S. 460, 471–72 (1965); *Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 134–35 (3rd Cir. 2002); *M.S. v. Wermers*, 557 F.2d 170, 174 n.4 (8th Cir. 1977); 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1571, at 511–12 (1991))). However, to properly exercise its sound discretion whether to appoint a *guardian ad litem*, a court must examine the Plaintiff's competency. *United States v. 30.64 Acres of Land*, 795 F.2d 796, 805–06 (9th Cir. 1986). A *guardian ad litem* is appropriate for a represented party "suffering from a condition that materially affects his ability to . . . consult with his lawyer with a reasonable degree of

rational understanding" or "to understand the nature of the proceedings." *Id.* at 805 (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

Defendants object that Plaintiff is not incompetent. The Court agrees that it is not clear Plaintiff is permanently mentally incompetent. But it is also clear that her physical condition is dire and that her mental competence is at best inconsistent. Plaintiff's counsel has attested that Plaintiff has had difficulty communicating with counsel, and that it took several attempts to speak with her simply to obtain a lucid agreement to the contents of the present declaration counsel prepared for her. During this lucid moment, Plaintiff indicated her desire that her adult children be substituted in her place. Given these uncontested facts, the Court will not require Plaintiff to appear at a further hearing for an examination of her competence. The Court is convinced that Plaintiff's best interests cannot be furthered without an appointed representative to assist her and therefore will appoint Jill Gonzales and Bryce Mower as *guardians ad litem* for Plaintiff in the present case and substitute them, in that capacity,[2] for Plaintiff.

///
///
///
///
///
///
///
///

---

2 The Court will not substitute Gonzales and Mower outright in place of Plaintiff. The action belongs to Plaintiff alone unless and until she transfers it under state law (if possible) or until she passes away, in which case the appropriate heir(s) or assign(s) can be substituted.

## CONCLUSION

IT IS HEREBY ORDERED that the Motions to Dismiss (ECF Nos. 28, 29) are DENIED.

IT IS FURTHER ORDERED that the Motion to Lift Stay of Discovery (ECF No. 35) and the Motion to Substitute Party (ECF No. 34) are GRANTED.

IT IS FURTHER ORDERED that Jill Gonzales and Bryce Mower, as *guardians ad litem* for Lisa Bonta, are SUBSTITUTED for Lisa Bonta.

IT IS SO ORDERED.

Dated this 18 day of October, 2018.

_____
ROBERT C. JONES
United States District Judge